## DICKERSON v. SMITH.

1. Findings of fact by a circuit judge from conflicting testimony, partly oral and partly written, reversed—the circumstances surrounding the transactions constraining this court to different conclusions.

2. The statute of limitations does not run against legatees as to matters embraced in a partial settlement made with them by the executors in the Ordinary's office, the estate not being wholly administered, and the office of executors continuing to exist.

3. Where executors of full age induce their sister, a legatee, who has just passed her majority, to enter into a pretensive settlement of the estate, made with a view of throwing difficulties in the way of a creditor, such legatee is not *in pari delicto* with the executors, and may afterwards have the settlement reopened for the purposes of a full accounting by them.

4. A settlement made by a life tenant with the executors, reopened in behalf of herself and her children (the remaindermen), such settlement having been pretensive merely, and without full knowledge by her; and hence, any consent on her part to be charged in such settlement with amounts for which she was not properly chargeable, would not bind her in a subsequent accounting.

5. This Court would hesitate to sanction an investment in Confederate bonds made in January, 1864. Where the funds so invested were realized from the sale of real estate made during that month for cash, in violation of the express directions of the will, and then set apart by the executors to one of themselves as trustee for a beneficiary under the will, such appropriation was disallowed.

6. A trustee, who had resisted the proper demands of his *cestui que trust*, and acted adversely to their interests, removed from his office and another trustee appointed in his place.

Before WALLACE, J., Laurens, May, 1880.

Hons. J. H. Hudson and T. B. Fraser sat in the place of the Chief Justice, and Mr. Justice McGowan, who had been of counsel in the cause.

This action was commenced in 1872 by W. F. A. Dickerson and Lucy W., his wife, and the minor children of the latter, against William T. Smith and John R. Smith, executors, and Joel F. Smith, James Smith, Mary Smith, Basil H. Smith and Charles L. Smith.

The opinion makes a statement of the case. The testi-

mony of the two adult plaintiffs and of Basil H. Smith, in behalf of the plaintiffs was taken before the clerk and read at the trial. The witnesses W. F. A. Dickerson, B. H. Smith and C. P. Sullivan, produced by plaintiffs, were sworn in open court before the presiding judge, as also were the witnesses for the defendant, W. F., Joel F., John R. and Charles L. Smith, and others. The substance of their testimony is stated in the opinion. It related principally to the issue, whether the settlement of 1866 was real or pretensive. The circuit decree was as follows:

To the complaint in this action the defendants demur upon the grounds of improper joinder of parties and improper joinder of actions. The controversy relates to the estate of John Smith, deceased, in which all the defendants claim an interest, and the complaint seeks, together with other things, to impeach an alleged settlement of the estate, to which all of the defendants were parties. The code, in providing who shall be parties, declares in section 141, " Any person may be made a defendant who has or claims an interest in the controversy adverse to the plaintiff, or who is a necessary party to a complete determination or settlement of the questions involved therein." The defendants therefore, all legatees under the will of John Smith, are properly before the Court, and being before the Court, all questions between the parties arising out of the main subject of controversy are properly cognizable in the same action as, for instance, where an executor is also appointed by the will a trustee, whether he accepted the trust, and if so whether he has discharged any part of his liabilities as executor, by receiving or applying any of the funds of the estate as trustee, or whether he should be prevented from receiving any part of such funds as trustee, &c.

Besides, the defendants have answered the whole complaint. The defendants can demur to the whole complaint or answer the whole complaint, or demur to part and answer part, but not answer and demur to the whole complaint or answer and demur to the same parts of the complaint. The demurrer therefore is overruled.

It appears that John Smith died in March, 1861, leaving his last will and testament in full force and effect, and leaving his widow Mary and seven children surviving him. His will provided that his whole estate should be sold, and the proceeds divided into eight equal parts, one of which he gave to the widow, and one to each of his several children, all the legatees except Charles and Basil, and his only daughter, the plaintiff in this action, to account for certain advancements made to them by the testator in his lifetime; and the defendants W. T. Smith and John R. Smith were appointed executors upon condition of giving bond and lawful security for the faithful performance of their duties. Of the share of Lucy, the will gives to W. T. Smith $30,000 in trust for Lucy during her natural life, and at her death over to her issue.

The executors named in the will executed the required bond, qualified as executors, and entered upon the administration of the estate. According to the directions of the will they proceeded to sell the real and personal property of the estate, and sold during the year 1861, and the year 1864, the whole estate, except the stocks and notes held by the testator at his death. All the lands and negroes, except some town lots at Laurens and Abbeville, were sold in the year 1861, on a credit of one and two years, as the will directed. The lands and negroes then sold were purchased by members of the family, except the Kinman lands, which were purchased by Waddy T. Irby, who, in the life time of testator and after the execution of the will, had intermarried with the plaintiff Lucy, and who subsequently fell in battle during the late war.

The purchasers, including Waddy T. Irby, executed notes to the executors for the purchase money. Lucy herself made no purchases. The executors proceeded to collect funds due the estate upon personal notes and from dividends upon stock, and to pay out upon liabilities and advance to distributees, until during the year 1863, they found themselves in possession of a large amount of Confederate currency. There is no allegation or proof that any part of this money

was improperly received. The executors allege that of this money W. T. Smith invested $13,400 in Confederate bonds as trustee for Lucy, and produce bonds in Court with the words "Bonded for Lucy Irby, February 20th, 1863," indorsed upon each bond. During the year large amounts were advanced to the other legatees in Confederate currency.

The aggregate of these advancements, added to the amount alleged to have been invested for Lucy, make a larger sum than the executors had in their hands in the year 1863, according to their returns to the Ordinary. It is argued, therefore, by plaintiff's attorney, that the investment for Lucy could not have been made as alleged. While an investment of their own funds in Confederate bonds for Lucy's benefit might not, under the circumstances be sustained, yet payments to legatees who were *sui juris* at their request or with their consent, was certainly legitimate, although made with the private funds of the executors, and if advances were kept within the amount of the respective shares of the legatees, the executors would be entitled to be credited therefor. The executors had in their hands during the year 1863, funds of the estate to an amount largely in excess of the sum alleged to have been invested for Lucy's benefit. They are entitled to the presumption that they invested these funds of the estate for Lucy, until the contrary appears, and a breach of trust will not be presumed where fidelity is consistent with the facts that appear. I therefore find, as matter of fact that the funds invested that year for Lucy, were funds of the estate of John Smith.

In January, 1864, at the request of some of the legatees, the remaining unsold real property of the estate, consisting of town lots at Laurens and Abbeville, was sold. The purchaser of the Abbeville town lots paid his bid in Confederate bonds. $14,900 of these bonds were appropriated by W. T. Smith, as he testified, for the trust estate of Lucy, and the bonds were produced in Court, endorsed as the other bonds previously referred to. W. T. Smith also produces two receipts which were signed by his *cestui que trust* Lucy.

For the purposes of this decree it will be necessary to copy one only, to wit: "Received of W. T. Smith, my trustee, 115.72, it being a portion of interest due on trust funds in my hands, with commissions added. Feb. 18, 1864. Lucy Irby."

In August, 1866, by agreement all the legatees met and made a settlement of the estate among themselves, which settlement was subsequently affirmed by all of the parties before the Ordinary and made of record. It is alleged in the complaint that this was sham and not intended to be binding upon the parties, and as to this point much testimony has been submitted. I am satisfied from the testimony that this settlement was intended to be final and conclusive as to all the matters embraced in it. The whole estate, except the stocks, had been sold, and most of it purchased by several of the legatees. Many of the notes held by the testator in his life time were produced at this settlement, and the liabilities of each legatee on account of advances made by the testator in his lifetime, and by the executors afterwards, and an account of the purchases at the sale of the estate were ascertained. The executors still held the stocks and a number of the notes. The stocks were then divided according to their full value, by agreement; each legatee receiving in stocks such an amount which, added to what each had previously received, made all equal.

As previously stated, W. T. Irby, then the husband of Lucy, had, at the sale in 1861, bid off the Kinman land, and had, for the amount of this bid and for some other property of the estate bought by him, executed his note to the executors, with his mother as surety. Waddy Irby had died during the war, and by an arrangement between his mother and the executors, his note was cancelled and given up and the land given up to the executors. At the settlement above referred to this land was assigned to C. L. Smith, one of the legatees.

Before this settlement the parties in interest had become aware of a large outstanding liability of the estate. The

testator in his lifetime had signed a note as surety to one Dullas, a resident of Philadelphia, upon which action was about to be brought and the chief burden of the payment of which would probably fall upon the estate of testator, and upon which judgment was subsequently recovered for about $125,000. The settlement above referred to was hastened and had, with the understanding among the legatees, and for the avowed purpose of throwing difficulties in the way of the collection of the liability, that a compromise of it might be more easily effected.

At the time of said settlement, a number of personal notes were left in the hands of executors, the proceeds of which were to be applied to the Dullas claim, and to the other liabilities of the estate, and the balance if any, to be divided among the legatees. The Dullas claim has been compromised for a comparatively small sum and extinguished by the executors. For the notes left in the hands of the executors they have not accounted.

At what is called the settlement, $1,700 face value in Ga. R. R. stock was added to the $28,300 previously invested for Lucy, making the $30,000 full value, provided by the will as a trust fund for the benefit of Lucy. Lucy was also charged with the amount of the purchases of her husband, W. T. Irby, at the sale, except the Kinman land, and charged also with advances made to her by the testator in his life time, and after the execution of the will. The defendants' attorneys allege that these charges were made with the consent of Lucy, and I find as matter of fact that she did consent.

The foregoing statement I find to be the facts in this case.

The first question of law arising on the facts, relates to the investment in Confederate States bonds by W. T. Smith for Lucy. W. T. Smith was appointed by the will trustee for Lucy, and one of the executors. He qualified as executor and there is no question that he accepted the office of trustee. It is not alleged or proved that the Confederate States currency came to his hands improperly, for there is

nothing to show that existing, and secure investments were called in, but, on the contrary, it is to be collected from the evidence in the case that these funds were realized from personal notes due the testator, and sale notes past due, which it was the duty of executors to collect, and for which they would have been responsible if lost though their negligence; and if it was their duty to collect these demands, it is a historical fact that the only currency in which they could be paid was Confederate States currency.

It has been repeatedly held by the Supreme Court of this State, that it is not a breach of trust for a fiduciary to invest Confederate States currency that he has received in Confederate States bonds. (*West v. Cauthen*, 9 *S. C.* 45.) If such investment is not in itself a breach of trust, does the fact that it was made for Lucy at the time it was make it so? This question must be considered from the point of view of the trustees at the time, and in connection with the circumstances existing at the time. How much wiser we often are after the event. Several of the legatees had bought largely at the sales and given their notes. They naturally expected these purchases to be set off against their distributive shares of the estate. Large sums in Confederate States currency were being paid by the executors to the distributees at their request, which, of course, would be set off also. Lucy had bought nothing, therefore had received no Confederate States currency. The will required that $30,000 be invested for her, and this was the only investment they were required by the will to make. (*Story's Eq.* § 90, cited in *Lay vs. Lay*, 10, *S. C.* 215.)

The Confederate currency was as good as any assets they had, for all the notes they had could have been paid in that currency. They were executing the will. The circumstances of the estate justified the appropriation of that amount to that object, and the *cestui que trust* subsequently received part of the interest on the investment. It will be observed that there was no change of investment by the trustee, but when in funds as executors of an estate out of which a trust fund was to be raised, he invested funds of

the estate for the benefit of the trust estate, and thereby and then changed his relations to the funds so invested, ceasing as to that investment his functions as executor and becoming trustee. And the *cestui que trust* being *sui juris*, having acquiesced in the investment by receiving interest, and by lapse of time, can no more charge him with the loss of the investment on the ground that the investment was made before the settlement of the estate, than other distributees could charge him for advances made to them in Confederate States currency, before the final settlement of the estate.

I therefore find as a matter of law that W. T. Smith is not responsible for the loss of the funds invested in Confederate States bonds for the trust estate of the plaintiff Lucy. (See *West v. Cauthen, supra.*)

I have already found as matter of fact that the settlement of 1866 was intended by the parties to be final and conclusive as to all the matters covered by it. It follows that it is binding upon the plaintiff, unless it can be impeached for fraud. It is competent also to show a mistake in the calculation. The allegation that the settlement was sham, and that the plaintiff Lucy was imposed upon by false representations to that effect, is not sustained by the proof. The plaintiff herself acted under it and disposed of a part of the property assigned to her then, as if she knew that her title to it was absolute. It will be remembered that the shares of the distributees were then made equal, or nearly so, by adding to what each legatee had received such an amount in stocks as would produce that result. Except the assignment of the Kinman land, under the circumstances previously stated, to C. L. Smith, only stocks were divided at that settlement. And these were estimated at their face value because, as was testified by several of the parties at the hearing, they were utterly ignorant at the time of their value.

So none of the parties were in a condition to withhold any knowledge or practice any concealment in regard to these securities, or knowingly exercise any influence hurtful to others or advantageous to themselves. (*Hill Trust.* 161

*et seq.*) They all stood upon the same plane, one with as much knowledge as another. There was, therefore, no room or ground for the inference of fraud from the relations of the parties. If the division subsequently turned out more disastrously for some than for others, it was a misfortune, and does not affect the character of the transaction. That must be determined by the circumstances and facts that attend the transaction itself. When Lucy agreed to the settlement, it may be observed that she was dealing not only with the executors as such, but with all the parties in interest, and it certainly was competent for her to bind herself to all the settlement embraced in the absence of fraud, and no fraud is shown.

Although the settlement was spoken of and called a final settlement, in point of fact it was not so, for a large number of notes, assets of the estate, were left in the hands of the executors to be administered. The statute of limitations does not begin to run in favor of executors from each transaction, although that transaction may be considered as final to all matters embraced in it, but only from a settlement or accounting embracing all matters relating to the trust. This settlement, by the admission of all parties, contemplated a future and further accounting by the executors, which has not been had, and the statute, therefore, has not yet begun to run in favor of these executors. The settlement, then, is yet open for the correction of error of calculation.

It is therefore ordered and adjudged that neither the executors nor W. T. Smith are liable for losses on account of the investment of Confederate States currency in Confederate States bonds, for the benefit of the plaintiff, Lucy Dickerson. That the settlement in 1866 between all the parties was a valid and binding settlement, and only open for errors of calculation. That the executors do account for the remainder of the estate of John Smith, unaccounted for, before the Master of Laurens County. That the parties have leave to apply at the foot of this decree for such orders as may be necessary to complete the settlement of the estate.

From this decree both parties appealed. The exceptions raise the points considered in the opinion of this Court.

Messrs. *George Westmoreland, W. H. Parker, Thomas Westmoreland* and *James Farrow*, for the plaintiffs.

Messrs. *Holmes & Simpson, Y. J. Pope* and *B. W. Ball,* for defendants.

April 19, 1882. The opinion of the Court was delivered by

MR. JUSTICE HUDSON. On the first day of January, A.D. 1856, John Smith, late of the County of Laurens, State of South Carolina, duly executed his last will and testament, wherein he bequeathed to his wife, Mary, in lieu of dower, the one-eighth part of the proceeds of his estate (which was directed to be sold by his executors on a credit of one and two years), and to each of his seven children the one-eighth part of the proceeds of the estate when sold as directed. All the children were required by the testator to account for certain specific sums of money advanced to them previously by him, except Basil H. Smith and Lucy W. Smith, who are excused by the testator from accounting for any advancements previously made to them by him. In the copy of the will contained in the brief the testator is silent as to his son, Charles L. Smith. whose name is not mentioned, nor is any disposition made of the one-eighth which was evidently intended for him—clearly a *casus omissus.*

Of the share of Lucy the testator thus disposes : " The remaining one-eighth part of my estate, it is my will be disposed of as follows, to wit : I give to my son, Wm. T. Smith, thirty thousand dollars thereof to be held by him as trustee for the sole and separate use of my daughter, Lucy W. Smith, during her natural life, neither the principal sum nor the income thereof to be subject to the debts or contracts of any husband she may hereafter have, and after her death the same to go to such children as she may have, if any, discharged of all trusts. But should my said daughter die leaving no issue surviving her then the said funds to be distributed among her next of kin

as in cases of intestacy. The remaining portion of said one-eighth part of my estate I give to my said daughter, Lucy W. Smith, absolutely, she not to account for advancements heretofore made by me."

Wm. T. Smith and John R. Smith were nominated as executors of the will, and were required by the testator to give well secured bonds for the faithful discharge of their duties.

In March, A.D. 1861, the testator died, leaving this will of full force, and leaving an estate estimated to be worth five hundred thousand ($500,000.00) dollars. He left surviving him his widow, Mary Smith, and seven children, Wm. T., John R., Joel F., and James, children of his first wife; and Lucy W., Basil H. and Charles L., children by his surviving widow. The executors nominated in the will had the same duly admitted to probate, and took upon themselves the administration, by qualifying and giving bond, as required by the testator.

In 1861 they made several sales of property, real and personal, one on April 11, one on April 16, one on November 19; and again in January, 1864, two separate sales, mostly of real estate in the towns of Laurens and Abbeville. At these sales the four elder brothers, sons of the first marriage, purchased largely of land, negroes, and other personalty; the widow bought a part of the realty, but Basil H. and Charles L., who were minors, and Lucy W., who had been married to Waddy T. Irby, purchased nothing. W. T. Irby, her husband, however, did buy freely of the personalty, and also purchased the Kinman tract of land for $17,000, for all of which he gave his notes to the executors. The result of all the sales was that the bulk of the real and personal estate sold was bought by the executors and their two full brothers, Joel F. Smith, and James Smith, the widow getting but a small part, and her three children nothing by purchase. Besides the land and negroes, the estate consisted of various choses-in-action, and a large amount of stock of railway companies and banks.

The war closed before there was any settlement of the estate, and indeed it was not in a condition to be settled. All the property had not been sold, the choses-in-action remained

uncollected, and the debts of the estate were not all paid. Such was the condition of things when in 1866 it became known to the executors that one Mr. Dullas of Philadelphia held a bond against Augustus M. Smith of Abbeville for the purchase money of negro slaves for about one hundred thousand ($100,000) dollars, upon which John Smith, the testator, was a surety. This information was communicated to the family, and very naturally created uneasiness and alarm. The condition of the estate of the principal debtor, and the circumstances of the co-sureties were such as to excite a fear that the burden of this claim, if enforced, would fall heavily upon the estate of John Smith, and probably prove disastrous.

The validity of such debts was at that time seriously questioned, and compromises were being very generally made in consequence of their doubtful character. Eminent lawyers were consulted by the executors as to the best course to be pursued. All united in counseling the executors to hasten the settlement of the estate, with a view of enabling them to obtain of Mr. Dullas as liberal terms in settling this debt as possible. Impressed with this view of expediency and policy, they hastened to take the necessary steps to carry it into effect. Although the estate was in no condition to be partitioned and settled, yet family meetings and consultations were speedily had, at which the executors advocated the urgent necessity of dividing the estate, because of the danger impending from the large claim of Dullas.

Accordingly, the legatees held their first meeting at the house of W. T. Smith for the purpose of carrying out this scheme of a settlement, but Lucy W., who was then a young widow, her husband having been killed in battle, not being present, the meeting was adjourned to be held at a future day at the residence of the testator's widow, and Lucy was sent for. Pursuant to adjournment all parties met at Mrs. Mary Smith's on August 21st, 1866, and after a full explanation by the executors of the nature of the crisis, a family settlement and partition of the estate was effected, and receipts for their respective shares were passed by the parties to the executors. A notice was then published in a newspaper of the county to the

effect that the executors would, by permission of the Ordinary, settle the estate of the testator before that officer on September 25th then next ensuing, and calling upon creditors to present their demands on or before that day.

On the day appointed all parties in interest met at the office of the Ordinary for the County of Laurens, and there, with slight and unimportant alteration, had the partition and settlement of the previous meeting confirmed by a decree of that officer, and new receipts passed. This was accomplished on September 27th, that being the day on which the adjustment of the accounts, begun on the 25th, was brought to a close, but by some discrepancy which the Ordinary himself cannot explain, his decree bore date November 2d, 1867.

In order to give the settlement thus effected the appearance at least of being full and final, the legatees signed and delivered to the executors a paper purporting to be a transfer and assignment to the said executors of a large number of uncollected choses-in-action belonging to the estate, but which were not embraced in the division and settlement. In this transfer to the executors they pretend to make the said executors their agents to collect these assets, and with the proceeds to pay the debts outstanding against the estate, and to divide the surplus among the legatees.

In the discharge of this duty, they proceeded to institute suit upon some of these choses-in-action, and to collect others without suit, and, in so doing, they styled themselves executors, and suits were instituted against them as such—notably the suit of Mr. Dullas, in which he recovered judgment against them as executors for the sum of one hundred and twenty-five thousand ($125,000.00) dollars. In the year 1870, they compromised this judgment debt by paying as the share of John Smith's liability thereon, the sum of five thousand dollars, a like sum being paid by each of the other obligors.

This large and only debt having been paid, the plaintiff, Lucy W., (who had removed to Georgia and intermarried with F. A. Dickerson), applied to the executors to have a final and *bona fide* settlement, alleging that the only obstacles to a settlement, to wit: the Dullas debt, had been removed by the

compromise effected. Failing to induce the executors to consent to a settlement, she, her husband, and her children, in March, 1872, began this suit, the object of which is to compel the executors to account, to have the true amount of her one-eighth part of the estate ascertained and paid over to her, and the trust portion thereof delivered into the hands of a trustee other than W. F. Smith. In her complaint she alludes to the settlement of August 21, 1866, at Mrs. Mary Smith's, which was afterwards confirmed in the office of the Ordinary, Sept. 27, 1866, as one made at the instance of the executors and elder legatees only as a temporary expedient to enable them to deal more advantageously with Mr. Dullas, whose claim was frightfully large. Plaintiffs charge that the said settlement was therefore merely pretensive, and so understood by all; that it is fraught with gross errors, that the accounts and partitions were stated and arranged by the executors and elder brothers without any explanation to herself and younger brothers, with the express understanding and promise that a final and correct settlement should be made so soon as the Dullas debt could be arranged. Under such representations and promises, she signed the receipt without understanding or deeming it necessary to understand the statement of the accounts and partitions, the result of which is, that she has received of her fictitious share the merest pittance.

The executors and their co-defendants demur to the complaint for multifariousness, in that several causes of action are joined improperly, and because, as to some causes of actions, the complaint does not state facts sufficient to constitute such.

The defendants answer to so much of the complaint as demands an accounting, and interpose as a bar thereto the settlement of Sept. 27, 1866, under the decree of the Ordinary, which they allege was well understood, was full, fair, correct, and *bona fide*, made and intended as a finality; that the executors were thereby discharged from further liability by the Ordinary, and the plaintiffs are consequently estopped by the decree in the suit to which Mrs. Dickerson was a party. They also interpose the plea of the statute of limitations as a bar to the action. In behalf of W. T. Smith, as trustee of Lucy

W. Dickerson, the special defense is set up, that during the war he invested of her trust estate twenty-eight thousand three hundred ($28,300.00) dollars, in Confederate States bonds, and seventeen hundred dollars in Georgia Railroad and Banking Co. stock.

In 1881, at the February Term of the Court of Common Pleas for the County of Laurens, this cause was heard by Judge W. H. Wallace. A great deal of testimony, oral and written, was submitted, and the brief brought up to this court is necessarily voluminous, because the questions upon which the issues turn are really more of fact than of law. The presiding Judge overruled the demurrers to the complaint, as we think very properly, because there is no misjoinder of causes of action in violation of the provisions of the statute, nor can it be correctly alleged that, as to any branch of the case, there is a failure to state facts sufficient to constitute a cause of action.

Proceeding then to determine the cause upon the issues raised by the complaint and answer, the presiding Judge finds as matters of fact: 1st. That W. T. Smith, as trustee for Lucy W. Dickerson, did, in the years 1863 and 1864, invest of the funds of the estate of John Smith twenty-eight thousand and three hundred ($28,300.00) dollars in bonds of the Confederate States, and seventeen hundred ($1700) dollars, in stock of the Ga. R. R. and Banking Co. 2. That the settlement of Sept. 27, 1866, confirmed by a decree of the Ordinary was intended to be final and conclusive as to all matters embraced in it. 3. That it was, however, only a partial settlement, and left undivided a large number of *choses in action* of the estate in the hands of the executors, to be collected and applied to the payment of the Dullas claim, and other liabilities of the estate. Wherefore the fiduciary relation of the executors to the legatees and creditors was not terminated by this settlement, which he finds " was hastened, and had with the understanding among the legatees, and with the avowed purpose of throwing difficulties in the way of the collection of the liabilities (the Dullas debt), that a compromise of it might be more easily effected." 4. That at the said settlement Lucy W.

was charged with the purchases made by her husband, W. T. Irby, at the sale, except the Kinman land; and also with all advancements made to her by her father in his lifetime; but that this was done with her consent. As matters of law he concludes, *First*, That the investments made by W. T. Smith in Confederate Bonds were properly made. *Second*, That when made, there was nothing in the course of the administration to prevent W. T. Smith from receiving this fund from the executors for his *cestui que trust*, and that the said Smith, as trustee, is not chargeable with the loss of the investment. *Third*, That the settlement of Sept. 27, 1866, being intended to be final *pro tanto*, cannot be impeached except for fraud, but may be corrected for errors in calculation. That the attempt to impeach it for fraud having failed, it must stand, except as to errors in calculation. *Fourth*, That the settlement, however, was not of such a character as to give currency to the statute of limitations pleaded by the executors as a bar to an accounting, because it was not an act showing an intention on their part to divest themselves of the trust which their office imposed. A large part of the estate still remained in their hands, for which they have not accounted, but for which they are liable to account. Judgment is accordingly entered against the executors for this further accounting alone, and the investments by W. T. Smith are sustained.

From this judgment both plaintiffs and defendants have appealed to this court, the defendants from the decree of the Judge on the question of the bar of the statute of limitations, and the plaintiffs from so much of the decree as determines questions of law and of fact against them.

It is with hesitation and reluctance that this court will reverse findings of fact by the court below. The Circuit Judge possesses a fairer opportunity to weigh testimony, especially that taken in open court, than is or can be enjoyed by this court. The testimony, however, in this case comes to us so fully reported, and is of such a character as to enable us to weigh it satisfactorily. The case has been fully and ably argued on both sides on the questions of fact as well as of law,

and we have carefully reviewed and considered the whole case as presented, feeling a lively sense of the interesting nature of the questions involved, and the grave consequences of the issues to the parties litigant.

We concur with the Circuit Judge in holding that the statute of limitations is not a bar to this action. We do not perceive in the proceedings in the Ordinary's office, Sept. 27, 1866, as explained by the testimony of the witnesses, and by the subsequent conduct of the executors, an intention on their part to divest themselves of their trust. It was at most only a partial settlement and partition of the estate, and left in the hands of the executors a large amount of assets for future administration. The whole record of the proceedings, when examined, reveals this fact, and the testimony of witnesses confirms it. Neither the language of the decree (if it can be properly so called) of the Ordinary, nor the terms of the written instrument in which the legatees feign to re-transfer to the executors the uncollected assets, but which forms no part of that record, can prevail over the real facts of the case, so as to give currency to the statute of limitations as if it were a final laying aside of their trust by the executors. It in fact was not such an act, was not intended to be such an act, nor could it have been such in the condition in which the estate then was, and necessarily the trust must have for a season continued.

It is only when a fiduciary really lays aside his trust, or does some act manifesting clearly his intention to do so, that the statute begins to run against the trustee of an express trust. "It commences to run when it appears that the administrator has done some act brought to the notice of the parties affected by it, equivalent to an abandonment of such office, although such act may be in itself wrongful." Such is the language of the court in *Renwick* v. *Smith,* 11 *S. C.* 305, and this is in harmony with *Millez* v. *Alexander,* 1 *Hill Ch.* 25, *Long* v. *Cason,* 4 *Rich Eq.* 60, *Sollee* v. *Croft,* 7 *Rich Eq.* 34. Beyond this wholesome rule we are not prepared to so extend the rule as to apply the statute to acts of intermediate administration. If each separate act of an executor constituted an

event in his office from which the statute, as to that special transaction would take currency, manifold would be the risks and hazards encountered by distributees legatees and *cestui que trusts* generally. This plea of the defendants must fail, and the liability of the executors to account for their entire administration is unaffected by it.

We cannot concur, however, with the circuit judge in the view he has taken of the settlement of September 27, 1866. The testimony upon this issue is very conflicting and irreconcilable. Mrs. Dickerson, her husband, W. F. A. Dickerson, and her brother Basil H. Smith most positively state—especially the sister and brother—that it was not designed to be correct or binding; that it was merely pretensive and a sham, intended only as an expedient to enable the executors to obtain liberal terms of Dullas. They say that the scheme originated with the executors under legal advice, and was by them and their full brothers advocated and urged upon the younger children by the second wife, to whom they represented that a future second settlement would be had so soon as the Dullas debt could be arranged; and that all matters would then be fairly and equally adjusted, without regard to the then temporary statement of the accounts. Though advised against signing any papers by her counsel, Mrs. Dickerson says that she, relying upon the solemn assurances of the executors and their brothers, that it would not bind her, yielded to their importunities, and without examination into the correctness of the statement of the accounts, believing that she would be fairly dealt with, signed the receipts. Her brother, Basil H., corroborates her fully; but the executors and their full brothers, and also Charles L. Smith strongly deny their version of the case, and asseverate that the settlement was *bona fide* and binding, and so intended. We must therefore look to the record and the surrounding facts and circumstances to ascertain, if possible, which of this array of opposing and highly respectable witnesses are most strongly corroborated.

In the first place, the entire estate real and personal at that time (except perhaps some unsold fragment) had been, under direction of the testator, converted into choses-in-action; and

the stocks of banks and railway companies left by testator composed, with these choses-in-action, the whole estate or assets in the hands of the executors. We cannot think that these intelligent executors would so stultify themselves, nor that learned counsel would advise them to do so imprudent an act, as to eagerly parcel and partition out to the legatees the only means possessed by them to pay debts, to wit, personal assets, which the legatees in turn could easily place beyond the reach of creditors, and thus greatly accelerate the ruin of the executors. Such a proposition bears incredibility on its face; whilst it is consistent with the prevailing conduct of people in that day and time, when debts for slaves were rarely paid except by compromise, that these executors should have urged upon their co-legatees just some such a fictitious settlement as Mrs. Dickerson says this was intended to be; and furthermore that it should have been made of record in court, with a view to impress a creditor with an enlarged idea of the difficulties lying in his way of collection, and thus to induce him to compromise. We are now dealing solely with the fact; of the morals of the act we will speak hereafter.

Again, we are loth to believe that these brothers and trustees would willfully and deliberately so settle with an only sister, then a widow with two infants, as to deprive her of her whole patrimony; and that to effect so great a wrong, they would commit so gross an error as to charge her with her husband's purchases, and with those advancements which her father declared in his will she should not account for. Were the trustee who would do such a thing a stranger in blood to his *cestui que trust*, it would not be tolerated in a court of justice; but when the trustees, as in this case, are brothers of age and experience, and the *cestui que trust* is an only sister, just past her majority, and the widowed mother of two infants, charity to our fellowmen constrains us to think that such a settlement was not designed to be permanent and binding, but only pretensive and temporary. That the partial division of September 27, 1866, was intended merely as a stroke of policy, and to be temporary and subsequently corrected after the debt of Dullas was arranged, can be reconciled to an instinctive

desire to save as much as possible of an estate from a security debt. It is palliated by views of supposed business shrewdness and tact. But that a settlement so ruinous to a weak and helpless sister was designed by her trustees, who are her brothers, to be binding, is almost incredible.

When we come to consider the crisis of the estate, the material of which it was composed, the motive for the *appearance,* but not *reality* of a settlement; the time, place, and circumstances under which it was made; the haste that attended it, the form in which the accounts are stated and the papers drawn; the gross error and wrong apparent in ascertaining the share of Lucy W., and the subsequent course of conduct of all the parties, we are constrained to the conclusion that, at the time the parties did not intend that this partial distribution and settlement should be binding; and that their real intention was to use the exhibit or record of it as an expedient to accelerate the settlement of a heavy debt.

This, however, say the counsel for defendants, stamps the transaction with immorality, and fraud towards creditors, and that Lucy W., who knew of the motive, is *particeps criminis,* and is now estopped on that ground from disturbing the partition. We do not regard her as *in pari delicto.* She was not a trustee for creditors, had no duty to perform towards them as did the executors. They are the custodians of the estate, and trustees both for creditors and legatees. She did not stand on the same plane with her trustees. The scheme was of their own conception, and into it she was by them urged as the only means to save herself and others from ruin. That faith, confidence and trust which they inspired in her, they cannot now be allowed to reward by pleading this settlement in bar of a fair, full and correct accounting.

Such being our view of the facts touching the partial distribution of September 27, 1866, we are brought to an examination of its correctness and fairness, so far as the plaintiff Lucy W. is concerned. It is very evident that it cannot stand the test of scrutiny, and in the interest of the remaindermen, her children, as well as of herself, must be reopened. She is charged with over forty-one thousand ($41,000) dollars of notes

and accounts of her former husband, for which she is not liable, but we are told by witnesses that this amount really includes advancements with interest made by the testator, and for which she was not to account, which amounted to over thirteen · thousand ($13,000) dollars; and this testimony is verified by a statement which appears to.have been made first in the figures before the Ordinary. Whether she consented to this or not, does not affect the case provided the accounts were made up, as we have concluded, with the understanding that in a subsequent accounting all errors should be corrected, and a fair distribution made; and this we think equity and good conscience require to be done. But Mrs. Dickerson states that she was not informed as to how the account against her was made up, but left the whole matter to the executors, confiding in their assurances that the statement should not be binding. In this she is powerfully corroborated by the testimony and facts and circumstances above noted.

It remains only to consider the defence of Wm. T. Smith to Lucy W.'s claim to an account of the trust fund alleged to be in his hands. He says that he invested twenty-eight thousand and three hundred dollars ($28,300) of this in Confederate States bonds, about $13,400 in July, 1863, and $14,900 in January, 1864, and seventeen hundred ($1700) dollars in Ga. R. R. & Banking Co. stock; and the circuit Judge has found the fact so to be, and has sanctioned the investment. Could we agree with the circuit Judge in his finding of fact, we would hesitate to sanction the investment in Confederate bonds ($14,900) made in January, 1864.

On January 4, 1864, the executors sold for cash in Confederate currency, real estate in the town of Laurens, to the amount of twenty-eight thousand and four hundred dollars ($28,400.00) all of which, except to the amount of four thousand and three hundred dollars ($4300) was purchased by themselves. On the 11th day of the same month they sold real estate in the ·town of Abbeville for the sum of fourteen thousand and six hundred ($14, 600) dollars cash in Confederate currency. This was in direct violation of the direction of the testator, who enjoined upon them to sell on a credit of one and two years, the

purchase money to be secured by bond with ample security.
To make such sales, at such a time and for cash in a currency
vastly depreciated and rapidly becoming worthless, was in vio-
lation of the letter of this authority, and against every dictate
of prudence. The case appears still more unfavorable to them
in becoming the purchasers at their own rash sale at Laurens,
and selling to their full brother Joel F. Smith the property at
Abbeville, and then claiming to set apart to the trust estate of
their only sister, a widow with children, fourteen thousand and
nine hundred dollars ($14,900) of this almost worthless paper
at *par value.* This Court has gone as far as equity and justice
will countenance in sustaining investments in Confederate funds
by fiduciaries, but we are not aware of any case that goes to
the extent of sustaining a transaction similar to this.

But we are constrained to reverse the Court below in find-
ing as a fact that W. T. Smith *as trustee* made any investment
of trust funds in Confederate bonds. That he and his co-exec-
utor may have intended to set apart Confederate bonds for this
trust estate, and that the matter was talked of is perhaps true;
but that this was ever done in a legal manner and in due form,
we have not been able to discover satisfactory proof from the
evidence in the brief. In fact, that evidence upon which most
reliance is to be placed, satisfies us that the trustee is mistaken
in saying that he made the investment. If it be true, as he
says, that he regarded the settlement of Aug. 21, 1866, con-
firmed by the judgment of Sept. 27, 1866, as *bona fide* and cor-
rect, and final and binding as to all matters embraced in it,
then truly was it a matter of vital importance that his double
duty as executor and as trustee of Lucy should have been
rigidly and faithfully discharged on so serious an occasion. If
he had invested in good faith the trust estate almost entirely
in these bonds, *then was the time* to have made the fact clearly
known and plainly to appear. If he on the contrary held no
such investment in hand, then his plain and sacred duty was to
have stepped forward and protected her interest and not to
have permitted that which had *no value* to have been set down
to the account of her trust estate, as we will see was done.

Take either horn of the dilemma, and it will be seen that he

utterly failed to discharge his duty both to himself and to her. Her share, trust and absolute, of the estate was made up in that family settlement as follows, viz.:

Lucy W. Irby, notes and accounts of W. T. Irby............. $41,012.94
417 Shares Commercial Bank, at $25 per share................ 10,425.00
6 Shares S. W. R. R. Bank, at $125 per share................ 750.00
101 Shares G. & C. R. R. Stock, at $20 per share............. 2,020.00
4 Shares Newberry Bank, at $25 per share.................... 100.00

August 21, 1866.......................................... $54,307.94

Below this statement appears her receipt for all the above except thirty thousand dollars, to wit,—$24,307.94, showing that the balance of the aforesaid assets must be looked to out of which to find her trust estate. As was said above, the confirmation in the Ordinary's office changed the amount but slightly, but the above is the first and only detailed statement of the mode in which Lucy's share of the estate is ascertained. It is silent on the subject of Confederate bonds. They are entirely ignored, and the above assets are made to foot up her entire one-eighth of the estate. It is furthermore a noteworthy fact, although it appears in testimony that the Kinman land was taken from her, and allotted to Charles L., yet she stands charged here with so large an amount of notes and accounts of her husband, W. T. Irby, that she is either charged with the note for that land, or else Irby must have bought enormously of the personal property. It is further to be noted that in neither the settlement at Mrs. Mary Smith's, nor at the office of the Ordinary, nor at any other period of the administration, do we find, or hear, of any receipt given by W. T. Smith as trustee to the executors for this trust estate of Lucy, nor any part thereof, whilst receipts are given by every other legatee.

From a review of all the evidence we are forced to the conclusion that Wm. T. Smith, as trustee, not only did not invest funds in Confederate bonds as claimed, but that the executors have not as yet turned over and delivered to him any part of the said trust estate except the seventeen hundred dollars in Ga. R. R. shares; and to the trustee of Lucy W. these executors are still liable to account.

In reaching this conclusion we are influenced also by the fact that at the time the first investment in Confederate bonds is claimed to have been made, to wit, in 1863, the accounts of the executors do not show in their hands funds sufficient to make the investment, and we also give due weight to the fact that at no period when these investments are claimed to have been made was the estate in a condition to enable the executors to consent to this legacy to Lucy, or to pay over to her trustee the trust portion thereof; and so they seem to have thought, as is evidenced by the fact that no receipt has been passed nor settlement made betwixt these executors and Lucy's trustee; and W. T. Smith as trustee seems to have acted prudently in not giving a receipt.

We must not be understood, in what we have said regarding the sales of the lots in the towns of Laurens and Abbeville, as declaring those sales illegal and void, as that question is not before us; but we only intend to say that if the fact were that so late as 1864, the executors converted real estate into Confederate bonds *as an investment for a trust estate,* we would not readily sustain such conduct; but we have concluded that the investment was not in fact made by Lucy's trustee.

Wherefore it is the judgment of this Court that, in the interest of, and on behalf of the legatee Lucy W. Dickerson, and of her children as remaindermen, the respondents, John R. Smith and Wm. T. Smith, as executors of the last will and testament of John Smith, deceased, do account for the one-eighth part of the estate of said testator which came into their hands, or which should have come into their hands, in which said accounting reference must be had to the real facts and circumstances attending said administration and surrounding said estate, so that substantial justice may be done consistent with the principles herein announced, due effect being given only to the *bona-fide* dealings heretofore had betwixt said executors and legatee.

It is further adjudged that in view of the attitude of Wm. T. Smith towards the said Lucy and her children as revealed in the progress of this litigation, some other fit and suitable person, upon the application of Lucy, be appointed by

the Court below to take charge of the said trust estate. Also should the one-eighth part of the estate of John Smith, when ascertained, be but thirty thousand dollars or less, then the whole must be regard as trust property, and delivered to the trustee to be appointed by the Court below, she to receive only the excess of thirty thousand dollars, if such there should be, as her absolute estate.

It is further adjudged that the decree of the Circuit Judge be reversed in all respects wherein it is at variance with the judgment of this Court, and the principles herein announced; and lastly that the cause be remanded to the Circuit Court for the county of Laurens, for the purpose of carrying into effect this judgment in accordance with the facts as found, and the principles of law herein laid down.